1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALONZO HAMILTON,                      No.  2:14-cv-1985 DB P

12                 Petitioner,

13        v.                               ORDER

14   R. GROUNDS,

15                 Respondent.

16

17        Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a writ

18   of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered

19   against him on August 26, 2011 in the Sacramento County Superior Court on one count of

20   forcible oral copulation of fourteen-year-old C.G. and four counts of forcible oral copulation of

21   C.G. in concert with another.  He seeks federal habeas relief on the grounds that:  (1) the

22   erroneous admission of hearsay evidence denied petitioner due process; (2) the evidence was

23   insufficient to convict petitioner of five acts of oral copulation; (3) the trial court erred in failing

24   to instruct the jury on the lesser included offenses of battery, assault, and attempt; (4) the crime of

25   oral copulation is necessarily included within the crime of oral copulation in concert; (5)

26   erroneous aiding and abetting instructions violated his right to a jury trial and due process; and (6)

27   ////

28   ////

                                         1

unreliable DNA profile evidence violated due process.[1]  The parties have consented to the jurisdiction of a magistrate judge.  (See ECF Nos. 5, 10.)  Upon careful consideration of the record and the applicable law, the undersigned will deny petitioner's application for habeas corpus relief.

## BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's and co-defendant Garrett's judgments of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual and procedural summary:

> In mid-July 2000, 14–year–old C.G. went to the movies with her boyfriend Cameo, a guy named "Chris," and her neighbor. During the movie, C.G. orally copulated Cameo. A couple of days later, on the evening of July 18, Chris showed up at C.G.'s mother's apartment and invited C.G. to watch a movie at his grandmother's home.  As C.G. walked to the car with Chris, she noticed there was another person inside the car. Once inside the car, she saw Chris wave to two occupants of another car, who then followed them to a nearby park. When they arrived, C.G. asked Chris why they were at the park and not at his grandmother's house, and he told her not to worry, and that they would go to his grandmother's later. C.G. and the four men sat at a table in front of the restroom. All of the men were African–American and were in their late teens or early twenties.

> While they were sitting at the table, Chris told C.G. that he needed to talk to her, took her by the wrist, and led her into the restroom. Once inside, Chris stood in front of the door, pulled his pants down, pushed C.G. down, and inserted his penis in her mouth. She slapped his legs and attempted to stand up, but he "kept pushing it." At that point, she "started getting scared because in the bathroom it was real dark." After several minutes, one of the three other men from the table entered the restroom. She could not recall which one.

> The second man pulled out his penis and began to "play" with himself. At that point, Chris and the second man "were over [C.G.]

---

[1] Petitioner does not describe his claims in the form petition filed.  Rather, attached to petitioner's form petition are copies of his petition for review to the California Supreme Court (ECF No. 1 at 18-38), the decision of the California Court of Appeal denying both petitioner's and co-defendant Garrett's appeals (id. at 42-65), and his opening brief on appeal (id. at 70-125).  Petitioner's first four claims identified in the text are the claims raised in his appeal and petition.  At the end of his petition for review, petitioner states that he joins in two of co-defendant Garrett's claims, which are identified here as claims 5 and 6.  (See id. at 38.)  However, petitioner fails to attach any briefing from Garrett's appeal or petition regarding those claims.  Because this court liberally construes pro se filings, the undersigned will consider these issues based on their description by the California Court of Appeal in its decision, attached to the petition, rejecting them.

with their penises out." At some point Chris ejaculated, moved to the side, and the second man placed his penis in C.G.'s mouth. C.G. did not feel free to leave because Chris and the second man were holding her. She attempted to resist the second man, but he and Chris laughed and made derogatory comments directed at her. As C.G. was being forced to orally copulate the second man, Chris left for a while. C.G. was not sure whether the second man ejaculated.

When Chris returned, the other two men from the table were with him. At that point, there were "four people surrounding" C.G. in the restroom. She was scared. She tried to leave, but they would not let her. She did not know what they were going to do, so she just complied. A third man put his penis in her mouth while the other men laughed. She attempted to push the third man away. One of the men stopped after she slapped at his legs, but she could not recall which one. At trial, C.G. testified that she was sure she was forced to orally copulate three of the men but was unsure whether she was forced to orally copulate the fourth.

When the men finished forcing C.G. to orally copulate them, all four men stood over her and masturbated as she squatted down on the floor, and at least three of them ejaculated on her. At some point, Chris told the other men, "Her mom's on us. So we got to be cool," or something like that.

When the men were through, they allowed C.G. to leave the restroom. When she left, she rolled around on the grass in an attempt to get the semen off her clothes and hair. The men left in their respective cars. As they drove away one man shouted, "[T]hat's what you get for being so trusting, bitch," and another flipped her off. C.G. estimated that she was in the restroom for about an hour.

After rolling in the grass, C.G. began walking to her mother's apartment. On the way, she ran into a man who asked her if she was okay, and when she responded that she was not, he drove her home. When C.G. returned home, her hair and clothing were "all messed up" and she was crying. She told her mother she had been "violated," and that "they" had taken her to a park, drug her into a restroom, and "performed sexual acts on her." Her mother summoned the police and C.G.'s brother's girlfriend. The girlfriend arrived about five minutes later, before the police. C.G. was distraught and crying. C.G. told the girlfriend that she was in the restroom with some boys, and they made her perform oral sex on them.

Sacramento Police Officer Darrel Johnson was dispatched to C.G.'s mother's apartment at 9:40 p.m. When he arrived, C.G. was sitting on the floor with her hands covering her face and crying. She had scratches on her shoulder and white stains on the right thigh and left knee areas of her pants. C.G. told Johnson that she had gone to a park with "Chris, and another suspect who met up with another group of male blacks in another car," and she was forced to orally copulate "[a]ll four suspects." She also told him "that two of the suspects began rubbing their penises in their hands and ejaculated

on her." Johnson transported C.G. to U.C. Davis Medical Center for an evidentiary exam.

C.G. arrived in the emergency department at 11:00 p.m. and was examined for approximately two and one-half hours by Sheridan Miyamoto, a nurse practitioner with the Child and Adolescent Resource and Evaluation Diagnostic and Treatment Center. When Miyamoto asked her what had happened, C.G. stated that "she had gone to the park with a male she called Chris and some of his friends, and ... he had taken her into a bathroom and forced oral copulation on her. Then his friends came in and all of them forced oral copulation on [her]." C.G. also told Miyamoto that there were four men in the bathroom and that "all four of them began oral copulation and two actually stopped once she struck out at them and hit them." When taking notes during her examination, Miyamoto detailed the perpetrators by number so she could keep them straight. C.G. told Miyamoto that "number one and number two ejaculated and wouldn't stop despite [C.G.'s] protests. Number three and number four began to do oral copulation but stopped when [C.G.] hit them." She further indicated that three of the four men "ejaculated on to her body" after masturbating. Miyamoto collected C.G.'s clothing and scanned her body with a black light, looking for "any kind of a dried secretion on her skin." Miyamoto took samples of the dried secretions found on C.G.'s skin and cuttings from her hair. Miyamoto also collected C.G.'s clothing, placing each piece in a separate bag. The samples and the clothing then were sent to the Sacramento County crime lab.

Initially, the police were unable to identify any of the men, and C.G. "gave up" and attempted to block the incident from her mind. Eight years later, in 2008, she was contacted by Retired Reserve Officer Peter Willover, who works "cold" cases for the Sacramento Police Department. Willover advised C.G. that there had been a DNA "match" as to one of the men who assaulted her but did not tell her the individual's name. He asked her to look at a photographic lineup, and when she did so, she pointed to Hamilton. She told Willover, "I know this guy, but it's not [from] that. The guy, Chris, looks similar to him." C.G. later explained that her cousin had introduced her to Hamilton in 2004 or 2005, the two became friends and were intimate a couple of times. At no point during the time she was intimate with Hamilton did she think he was the person she knew as "Chris" from the park. She cried when she learned that the DNA found on her following the incident was a match for Hamilton and said she could not believe that Chris and Hamilton was the same person. At trial, C.G. identified Hamilton as the person she formerly knew as "Chris."

Officer Willover interviewed Hamilton on November 6, 2008, while Hamilton was in custody at Rio Consumnes Correctional Center. Willover explained that he worked cold cases and that Hamilton's name "ha[d] come up as a suspect in a sexual assault that occurred back in 2000, involving a 14–year–old girl in a park rest room at Wood Park on Bodine Circle." Willover also showed Hamilton a photograph of the victim, whom Hamilton immediately recognized as C.G. Hamilton said he did not "recall any of that

happening" but that he did recall "getting with" C.G. within the last year. He denied ever "raping" or "sexually assaulting" C.G. and stated that "[e]ight years ago I didn't even talk to [C.G.]." He denied ever having sex with C.G. in a park restroom and did not recall ever having sex with her when she was 14. He told Willover he "never forced that girl to do a damn thing" and that she is a "fucking liar." He also stated that "if it did happen, it happened, and she did it willingly." Finally, he denied ever going by the name "Chris."

Following the interview, Hamilton telephoned his "baby momma" Jasmine and told her that earlier that morning the police told him "this bitch [C.G.] said I raped her" and that it was "eight years ago" with "three other guys." Hamilton also said that he did not "remember dealing with [C.G.] in no ... 2000 period." During the conversation, Hamilton and Jasmine repeatedly referred to C.G. as a "bitch," and Jasmine said she wanted to kill C.G. After a while, Jasmine telephoned C.G., and Jasmine, C.G., and Hamilton engaged in a three-way conversation. Hamilton asked C.G. if he raped her eight years earlier, and C.G. responded, "You didn't rape me." C.G. told Hamilton that he and "three other dudes took me to that park, and you all had me give you ass and then you all left me up there." Hamilton responded, "I don't even remember that bro." C.G. explained, "I didn't know you. I knew you as Chris like but I didn't [put] those two together." Hamilton insisted he did not remember the incident in the restroom, and C.G. explained that "two days before we had went to the movie" with Cameo and C.G.'s neighbor. C.G. told Hamilton, "I don't know how you couldn't remember it's you and three other dudes. [¶] ... [¶] It done messed me up share." Hamilton asked C.G. if they had been drunk because he did not remember any such incident. Hamilton said that he remembered the movie with Cameo, but "that's the only thing I remember. I swear to God. So I'm like, was we drunk?" He also asked C.G. if he forced her to do anything, and she responded that she "did not want to do that." Eventually, Jasmine hung up on C.G., reminding Hamilton that his lawyer had told him not to talk to anyone.

In March 2010, Officer Willover received information that there had been a second DNA "hit" from the evidence collected from C.G. in 2000. He was informed that the DNA was a match for Garrett. Prior to that time, Garrett's name had never come up in Johnson's investigation. C.G. did not recognize Garrett from the incident or anywhere else.

Hamilton's DNA profile was found in samples taken from C.G.'s hair, tank top, and jeans. Garrett's DNA profile was found in samples taken from C.G.'s tank top, left arm, back, and jeans. DNA from a third unidentified male was also found. Hamilton's DNA profile is estimated to occur at random among unrelated individuals in approximately one in two quintillion of the African–American population, one in three sextillion of the Caucasian population, and one in eleven sextillion of the Hispanic population. Garrett's DNA profile is estimated to occur at random among unrelated individuals in approximately one in one sextillion of the African–American

> population, one in a hundred sextillion of the Caucasian population, and one in two hundred and seventy sextillion of the Hispanic population.

People v. Hamilton, Nos. C068430, C069220, 2013 WL 3961167, at *2-4 (Cal. Ct. App. July 31, 2013).[2]

## STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of

---

[2] A copy of the Court of Appeal's opinion was lodged by respondent on December 22, 2014. (See ECF No. 14.)

Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised."). For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the

////

8

presentation of evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'"  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013).

A summary denial is presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853 (citing Delgado v. Lewis, 223 F.3d 976, 981 (9th Cir. 2000)).  This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court."

Richter, 562 U.S. at 102.  The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

## PETITIONER'S CLAIMS

Petitioner seeks federal habeas relief on the grounds that:  (1) the erroneous admission of hearsay evidence violated petitioner's due process right; (2) the evidence was insufficient to sustain petitioner's conviction for four counts of oral copulation in concert and one count of oral copulation; (3) the trial court erred when it failed to instruct the jury on the lesser included offenses of battery, assault, and attempt; (4) the crime of oral copulation is necessarily included within the crime of oral copulation in concert; (5) erroneous aiding and abetting instructions violated his right to a jury trial and due process; and (6) unreliable DNA profile evidence violated due process.  Each claim is addressed below.

### I.      Admission of Hearsay Evidence

Petitioner contends the admission of testimony from the victim's mother, the victim's brother's girlfriend, Officer Johnson, and Nurse Miyamoto, which recounted the victim's statements after the crime, rendered his trial fundamentally unfair in violation of due process. (ECF No. 1 at 23-31; 88-114.)

### A.      Applicable Legal Principles

A federal writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)).  Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence."  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

Evidence must "'be of such quality as necessarily prevents a fair trial'" for its admission to violate due process. Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Therefore, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Id.

**B. State Court Decision**

The Court of Appeal held that the evidence was admissible under the prior inconsistent statement exception to the hearsay rule.

> Hamilton first contends that the trial court erred in allowing the prosecution "to rely on hearsay reports allegedly made by [C.G.] to a law enforcement officer [ (Johnson) ] and a forensic examiner [ (Miyamoto) ] to prove that four acts of oral copulation occurred, rather than three as testified to by [C.G.] in her sworn testimony at trial." As we shall explain, the trial court did not err by admitting the challenged statements because they fall within the prior inconsistent statement exception to the hearsay rule. (Evid. Code, § 1235.)

> The prosecution moved in limine to introduce C.G.'s statements to her mother, her brother's girlfriend, Johnson, and Miyamoto under the fresh complaint doctrine. Under that doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others...." (*People v. Brown* (1994) 8 Cal.4th 746, 750–751.) Evidence admitted under the fresh complaint doctrine may be considered by the trier of fact for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime. (*People v. Bernstein* (1959) 171 Cal.App.2d 279, 285.)

> The trial court indicated that C.G.'s statements, minus the details, were admissible under the fresh complaint doctrine. The court also

11

observed that C.G.'s statements to her mother were admissible under the spontaneous statement exception to the hearsay rule (Evid. Code, § 1240), and that her statements to Officer Johnson "probably" were admissible on the same basis. Hamilton's trial counsel objected to the admission of C.G.'s statements as spontaneous statements, arguing that C.G. had time to reflect before going home and reporting the incident. The trial court overruled Hamilton's objection, at least as to C.G.'s statements to her mother, describing the issue as "a slam dunk" and advising Hamilton's trial counsel that his arguments were not "even in the ball park...."

At trial, C.G. testified to a total of three acts of oral copulation. When specifically asked whether she was forced to orally copulate all four men, she responded, "I remember three for sure. [¶] ... [¶] ... There's one I'm unsure." The only evidence that C.G. was forced to orally copulate all four men came from Johnson and Miyamoto, both of whom testified that C.G. told them that she was forced to orally copulate all four men.

. . . .

Although Hamilton challenges the grounds for admission—the fresh complaint doctrine and the spontaneous statement exception to the hearsay rule—"[w]e review judicial action and not judicial reasoning." (*People v. Franklin* (2003) 105 Cal.App.4th 532, 535.) Thus, our focus is on whether the evidence was admissible on any ground, not whether it was admissible on the particular basis articulated by the trial court. (*Wilcox v. Berry* (1948) 32 Cal.2d 189, 192.) As we shall explain, C.G.'s statements to Johnson and Miyamoto concerning the number of men she was forced to orally copulate were admissible under the prior inconsistent statements exception to the hearsay rule.

" ' "A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770." [Citation.] "The 'fundamental requirement' of section 1235 is that the statement in fact be inconsistent with the witness's trial testimony." [Citation.] " 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement....' " [Citation.]' [Citation.]"[fn 2] (*People v. Homick* (2012) 55 Cal.4th 816, 859, fn. omitted; *see also People v. Hovarter* (2008) 44 Cal.4th 983, 1008–1009 (*Hovarter* ).)

. . . . [I]n this case, when C.G. testified that she was not sure if she was forced to orally copulate all four men, a question arose whether her proclaimed lack of memory was a deliberate evasion, which could give rise to an implied inconsistency, or a true case of failed memory. (*See Hovarter*, *supra*, 44 Cal.4th at p. 1008.) Johnson's and Miyamoto's testimony recounting C.G.'s prior statements were sufficiently inconsistent in effect to qualify as prior inconsistent statements. (*Ibid.*) Accordingly, those statements were admissible both to impeach the credibility of C.G.'s contrary trial testimony

and for the truth that she was forced to orally copulate all four, as opposed to just three, men.

> [fn 2] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; *or* [¶] (b) The witness has not been excused from giving further testimony in the action." (Italics added.) Here, C.G. had not been excused from giving further testimony in the action. Thus, the foundation requirements of Evidence Code section 770 were met.

Hamilton, 2013 WL 3961167, at *5-6.

The state court did not address due process implications of admission of the evidence. However, the Supreme Court has held that where a state court addresses some, but not all, of a defendant's claims, the federal court applies a rebuttable presumption that the state court ruled on the merits of all claims.  See Johnson v. Williams, 568 U.S. 289, 300-01 (2013).  The court finds no reason to rebut that presumption here and will consider that the state court rejected the federal due process claim on the merits.

### C.  Analysis

Petitioner argues that the testimony of four witnesses who recounted what the victim told them shortly after the crimes should have been excluded as hearsay and their admission rendered his trial fundamentally unfair in violation of his due process rights.  He primarily argues that the hearsay statement from Officer Johnson and Nurse Miyamoto were the only evidence that any more than three acts of oral copulation occurred and were therefore prejudicial.  Petitioner objects to the following testimony:

### 1.  Janice Houston

The victim's mother testified that C.G. was crying when she came home and said she had been "violated," and that they "performed sexual acts on her."  Houston called the police.  (2 RT 327-28.)

13

### 2. Monique Hardy-Nichols

Hardy-Nichols, the victim's brother's girlfriend, was summoned to the victim's home by a telephone call from Houston. (2 RT 322-23.) When she arrived, Hardy-Nichols found C.G. "distraught," "a little confused," and "crying." (2 RT 323-24.) She testified that C.G. told her "she was in the restroom with some boys, and they made her perform oral sex," and that this was against her will. (2 RT 324.)

### 3. Officer Johnson

Darrel Johnson testified that in 2000 he was a police officer with the Sacramento Police Department. (2 RT 332.) On the night of July 18, 2000, he responded to a call about a possible rape and picked up the victim from her mother's home. (2 RT 332-33.) The victim told Johnson that all four men had forced her to orally copulate them. (2 RT 334-35.) Johnson took the victim to the U.C. Davis Medical Center for an exam. (2 RT 337.)

### 4. Nurse Miyamoto

Sheridan Miyamoto testified that in the year 2000 she was a nurse practitioner who conducted forensic exams for the Child and Adolescent Resource and Evaluation Diagnostic and Treatment Center (the "CARE Center") at the U.C. Davis Medical Center. At that time children were admitted to the CARE Center when there were concerns about physical abuse, sexual abuse, or neglect. (1 RT 275-76.) On July 18, 2000, Miyamoto conducted a sexual assault examination of the victim in this case. (1 RT 279.) The victim told Miyamoto that all four men had forced her to orally copulate them. (1 RT 282.)

At trial, C.G. testified that she was only certain that three of the four men forced her to orally copulate them. "I remember definitely three did for sure, but I can't recall all four." (1 RT 143.)

Petitioner's argument focuses almost solely on the evidence's hearsay nature. However, as described above, a state's failure to comply with state rules of evidence is not a basis for granting habeas relief on due process grounds. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Jammal, 926 F.2d at 919. Petitioner does include some argument that the hearsay statements were unreliable. Petitioner points out that they were not made immediately after the crimes. According to petitioner, the evidence showed the attack ended around 8:00 p.m. and the police

14

were not contacted until 9:40 p.m. (ECF No. 1 at 105.) He also cites to testimony that the victim felt "obligated" to speak with Officer Johnson (1 RT 152), argues that she spoke to Nurse Miyamoto only after extensive questioning by Officer Johnson, and contends that medical records are an inherently unreliable place to get the facts of a crime. However, the defense had the opportunity at trial to make these arguments about the unreliability of victim's statements to these witnesses. Further, there is nothing inherently unreliable about statements made by a victim to her mother, to a friend, to a police officer, or to a health care worker shortly after a crime. See California v. Green, 399 U.S. 149, 163 n. 15 (1970) (admission of witness's prior inconsistent statement is only a due process violation where "a reliable evidentiary basis is totally lacking").

And, those statements were relevant both to test the victim's credibility on the stand that she could only recall for certain that she was forced to orally copulate three of the men and as evidence that all four men were involved. This is particularly true where, as here, the prior statements were made the day of the crimes and the victim's did not testify at trial until almost eleven years later. Finally, "[t]he fact that the evidence was damaging to petitioner does not mean his trial was rendered fundamentally unfair by its admission." Powell v. Runnels, No. CIV S-05-1786 GEB KJM P, 2009 WL 1749013, at *9 (E.D. Cal. June 18, 2009) (citing Jammal, 926 F.2s at 920), findings and recos. adopted, 2009 WL 2413786 (E.D. Cal. Aug. 5, 2009), affirmed, 408 Fed. App'x 96 (9th Cir. 2011). The court finds no basis for a due process claim.

Under § 2254(d), this court's review is strictly limited. No Supreme Court precedent establishes that the admission of hearsay testimony generally or of prior inconsistent statements violates due process. Cf. Green, 399 U.S. at 158 (no Confrontation Clause violation in admitting prior inconsistent statements where declarant is subject to cross-examination at trial). The state court cannot, therefore, be said to have unreasonably applied "clearly established" federal law. See Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court...it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.' "). Petitioner's first claim fails under § 2254(d).

////

////

15

1    **II.    Sufficiency of the Evidence**

2        Petitioner's claim on appeal was that the evidence was sufficient to convict him of only three

3    counts of oral copulation, but he was convicted of four counts of oral copulation in concert and

4    one count of forcible oral copulation.  (ECF No. 1 at 32-33; 115-118.)  The state Court of Appeal

5    agreed, in part.  It held that petitioner's sentence for forcible oral copulation must be stayed

6    because he could not be separately punished for the same act of oral copulation.  2013 WL

7    3961167, at * 8.[3]  Petitioner argues that his conviction for forcible oral copulation was

8    unconstitutional because both it and one of the oral copulation in concert counts relied on the

9    same act of oral copulation.  Petitioner further argues that there was insufficient evidence to

10   convict him of a total of four acts of oral copulation.

11       **A.  Legal Standards**

12           **1.  Standards for Sufficiency of the Evidence Claim**

13       The United States Supreme Court has held that when reviewing a sufficiency of the evidence

14   claim, a court must determine whether, viewing the evidence and the inferences to be drawn from

15   it in the light most favorable to the prosecution, any rational trier of fact could find the essential

16   elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

17   A reviewing court "faced with a record of historical facts that supports conflicting inferences

18   must presume—even if it does not affirmatively appear in the record—that the trier of fact

19   resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at

20   326.  State law provides "for 'the substantive elements of the criminal offense,' but the minimum

21   amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of

22   federal law."  Coleman v. Johnson, 566 U.S. 650, 32 S. Ct. 2060, 2064 (2012) (quoting Jackson,

23   443 U.S. at 324 n.16).

24       The Supreme Court recognized that Jackson "makes clear that it is the responsibility of the

25   jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.

26   _____

27   [3] The court stayed the sentence on the forcible oral copulation claim because the oral copulation in concert claim carried a longer potential sentence.  See 2013 WL 3961167, at *8 (Pursuant to Cal. Penal Code § 654(a), when an act is punishable in different ways, it "shall be punished under

28   the provision that provides for the longest potential term of imprisonment.").

A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011) (per curiam). Moreover, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" <u>Id.</u> (citing <u>Renico v. Lett</u>, 559 U.S. 766 (2010)). The Supreme Court cautioned that "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." <u>Id.</u>

### 2. State Law Standards

California Penal Code §288a(c)(2)(A) provides that a conviction of forcible oral copulation requires proof that the defendant committed "an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ."

Penal Code §288a(d)(1) defines the crime of forcible oral copulation in concert: "Any person who, while voluntarily acting in concert with another person, either personally or by aiding and abetting that other person, commits an act of oral copulation (A) when the act is accomplished against the victim's will by means of force or fear of immediate and unlawful bodily injury on the victim or another person . . . ."

The California Supreme Court has held that a defendant may be guilty as an aider and abettor if he "act[s] with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." <u>People v. Beeman</u>, 35 Cal. 3d 547, 560 (1984); <u>see</u> <u>People v. McCoy</u> 25 Cal. 4th 1111, 1117-18 (2001).

### B. State Court Decision

The Court of Appeal held that, under state law, convictions on multiple charges arising from a single act are permissible, but multiple punishments are not.

////

17

Hamilton contends there is insufficient evidence to support his convictions for one count of forcible oral copulation and four counts of forcible oral copulation in concert where, as here, there is evidence of four, not five, acts of oral copulation. According to Hamilton, "[a] defendant may not be convicted of both oral copulation and oral copulation in concert for [the same] act of oral copulation." Thus, he argues that absent evidence of a fifth act of oral copulation, he "could only be convicted of a maximum of one act of oral copulation as principal and [three] additional acts of oral copulation in concert." As we shall explain, his convictions are proper but his sentence on count one (forcible oral copulation) must be stayed.

"While section 654 prohibits multiple punishments, it is generally permissible to convict a defendant of multiple charges arising from a single act or course of conduct. [Citations.] However, a 'judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]' [Citation.] [¶] When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed. [Citations.] If neither offense is necessarily included in the other, the defendant may be convicted of both, 'even though under section 654 he or she could not be punished for more than one offense arising from the single act or indivisible course of conduct.' [Citation.]" (*People v. Sanders* (2012) 55 Cal.4th 731, 736 (*Sanders*).)

Here, Hamilton was convicted of one count of forcible oral copulation and four counts of forcible oral copulation in concert. The evidence established that C.G. was forced to orally copulate at most four men. Thus, Hamilton necessarily was convicted of one count of forcible oral copulation and one count of forcible oral copulation in concert based on the same act of oral copulation.

" 'In deciding whether multiple conviction is proper, a court should consider only the statutory elements.' [Citation.] 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.' [Citation.] In other words, '"[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former." ' [Citations.]" (*Sanders*, *supra*, 55 Cal.4th at p. 737.)

Section 288a, subdivision (d)(1) provides in pertinent part: "Any person who, while voluntarily acting in concert with another person, either personally or by aiding and abetting that person, commits an act of oral copulation (1) when the act is accomplished against the victim's will by means of force or fear of immediate and unlawful bodily injury on the victim or another person ... shall be punished by imprisonment in the state prison for five, seven, or nine years." Section 288a, subdivision (c)(2)(A) provides: "Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence,

18

duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years." The addition of the "acting in concert with another" language in section 288a, subdivision (d)(1) means that it is possible to violate section 288a, subdivision (c)(2)(A) without also violating section 288a, subdivision (d)(1). In other words, a defendant who, acting alone, commits an act of forcible oral copulation, would violate subdivision (c)(2)(A) but not subdivision (d)(1). Similarly, the addition of the "by aiding and abetting that other person" language in section 288a, subdivision (d)(1) means that it is possible to violate subdivision (d)(1) without necessarily violating subdivision (c)(2)(A). In other words, a defendant who voluntarily aids and abets another in committing an act of oral copulation by force would violate subdivision (d)(1) but not subdivision (c)(2)(A). [fn 4] Thus, the elements test is not satisfied. Accordingly, Hamilton was properly convicted of all four counts of forcible oral copulation in concert, even though one of those counts necessarily was based on the same act of oral copulation as his conviction for forcible oral copulation.

Hamilton, however, may not be separately punished for violations of section 288a, subdivision (c)(2)(A) and subdivision (d)(1) based on the same act of oral copulation even though multiple convictions for both offenses were proper. (Sanders, 55 Cal.4th at p. 743.) Thus, the question is which of Hamilton's sentences must be stayed. As relevant, section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Italics added.) The punishment for violating section 288a, subdivision (c)(2)(A) was three, six, or eight years. The punishment for violating section 288a, subdivision (d)(1) was five, seven, or nine years. Accordingly, section 288a, subdivision (d)(1) provided for the longest potential term of imprisonment. Thus, Hamilton's sentence on count one for violating section 288a, subdivision (c)(2)(A) must be stayed.

> [fn 4]    Given our conclusion, we need not consider Hamilton's contention that "his conviction on count one [ (forcible oral copulation) ] must be vacated because it was an offense necessarily included in one of the other counts [ (forcible oral copulation in concert) ] for which [he] was convicted."

2013 WL 3961167, at *6-8 (some footnotes omitted).

The Court of Appeal only briefly considered petitioner's argument that the evidence

supported only three, not four, total acts of oral copulation as follows:

> Erroneously assuming that we would conclude that evidence C.G. orally copulated four, as opposed to three, men should have been excluded, Hamilton argues that he could be convicted of a

19

maximum of two additional acts of oral copulation in concert. As detailed above, evidence C.G. orally copulated all four men was properly admitted. Thus, the question is whether Hamilton could be convicted of a maximum of three additional acts of oral copulation in concert.

Id. at *6 n. 3.

### C. Analysis

While petitioner contends his convictions for both forcible oral copulation and for oral copulation in concert violate federal constitutional standards, he argues the claim based only on state law standards. (See ECF No. 1 at 32-33, 117.) Federal habeas relief is not available to reexamine determinations of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). To the extent petitioner argues the two convictions for the same act of oral copulation violate due process, he cites no federal authority for this proposition and this court finds none.

Petitioner's argument that insufficient evidence supported his conviction for four counts of oral copulation in concert is based solely on his prior argument that evidence of a fourth act of oral copulation should have been excluded. (See ECF No. 1 at 32, 115.) As set forth in the prior section, admission of that evidence did not violation federal due process standards. The jury heard the victim's testimony that she was uncertain whether she was forced to orally copulate the fourth man and the testimony of Officer Johnson and Nurse Miyamoto that she told them on the day of the crimes that she was forced to orally copulate all four men. Considering the evidence at trial in the light most favorable to the prosecution, the jury could reasonably have found that four acts of oral copulation occurred. The state court's rejection of petitioner's substantial evidence claim was not objectively unreasonable. Petitioner's second claim will be denied.

### III. Failure to Instruct on Lesser Included Offenses

In his third claim, petitioner contends the trial court's failure to instruct the jury, sua sponte, on the lesser included offenses with regard to oral copulation in concert deprived petitioner of his right to be convicted by proof beyond a reasonable doubt as to each element of the offense in violation of due process and his right to a jury trial. (ECF No. 1 at 34-37; 118-121.) "[T]here is no clearly established federal constitutional right to lesser included instructions in non-capital cases." United States v. Rivera-Alonzo, 584 F.3d 829, 834 n.3 (9th Cir. 2009); see also Bortis v.

Swarthout, 672 Fed. App'x 754 (9th Cir. 2017); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (recognizing lack of Supreme Court ruling on this issue); Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("Under the law of this circuit, the failure of a trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."), overruled on other grounds, Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).  Therefore, petitioner's third claim will be denied because the state court's rejection of his claim did not violate clearly established federal law.

### IV.     Oral Copulation is Necessarily Included in the Definition of Oral Copulation in Concert

Petitioner's arguments to the California Supreme Court on this issue rely solely on the state law rule that "[m]ultiple convictions may not be based on necessarily included offenses."  (See ECF No. 1 at 37-38; 122-123.)  This issue was also raised in his second claim.  Petitioner failed to cite any federal standards for this issue in that claim either.  As described above, issues of state law are not cognizable in a federal habeas proceeding.  Claim IV will be denied.

### V.     Erroneous Aiding Abetting Instructions Violated Due Process

Petitioner argues that the instruction given at trial regarding aider and abettor liability misled jurors.[4]  (See ECF No. 1 at 59-61.)  The instruction petitioner challenges is CALCRIM No. 400.  The trial court instructed the jury as follows:

> A person may be guilty of a crime in two ways:
>
> One, he or she may have directly committed the crime. I would call that person the perpetrator.
>
> Two, he or she may have aided and abetted the perpetrator who directly committed the crime.

////

////

---

[4] As described above in note 1, petitioner did not brief this claim.  In his petition for review, he stated that he was joining in co-defendant Garrett's assertion of this claim.  However, he failed to attached Garrett's briefing to his petition.  Therefore, the court considers petitioner's claim based on the California Court of Appeal's description of it in its decision, which is attached to the petition.

> A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

(3 RT 656.)

Petitioner contends the trial court erred in so instructing the jury because the final paragraph of the instruction suggests that an aider and abettor is vicariously responsible for the intent as well as the acts of the perpetrator and is equally guilty with the direct perpetrator. In state court, petitioner primarily challenged the instruction on state law grounds. He cited People v. Nero, 181 Cal. App. 4th 504, 514 (2010) in support of his claim. In Nero, the court held that CALJIC 3.00, which preceded CALJIC 400, was misleading in violation of the defendant's constitutional right to a jury trial. 181 Cal. App. 4th at 518-19. This court will, therefore, look to that right as the basis for petitioner's federal constitutional claim in this case.

### A. Applicable Law

In general, a challenge to jury instructions does not state a federal constitutional claim. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Engle v. Isaac, 456 U.S. 107, 119 (1982); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). To warrant federal habeas relief, a challenged jury instruction cannot be "merely . . . undesirable, erroneous, or even 'universally condemned,'" but must violate "some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973); see also Estelle, 502 U.S. at 72 (holding that to find constitutional error, there must be a "'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution" (quoting Boyde v. California, 494 U.S. 370, 380 (1990))); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" Prantil v. California, 843 F.2d 314, 317 (9th Cir.1988) (quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)); see also Middleton v. McNeil, 541 U.S. 433, 437 (2004) ("If the charge as a whole is ambiguous, the question is whether there 'is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (quoting Estelle, 502 U.S. at 72));

Henderson v. Kibbe, 431 U.S. 145, 156–57 (1977). In making this determination, the challenged jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147); see also Prantil, 843 F.2d at 317 (The habeas court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984))).

Even if constitutional instructional error has occurred, a petitioner is not entitled to federal habeas relief unless the error "in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." Calderon v. Coleman, 525 U.S. 141, 147 (1998) (citing Brecht, 507 U.S. at 637-38); see also California v. Roy, 519 U.S. 2, 6 (1996); Cavitt v. Cullen, 728 F.3d 1000, 1010 (9th Cir. 2013).

## B. State Court Decision

The trial court instructed the jury in the language of CALCRIM No. 400 as follows: "A person may be guilty of a crime in two ways: [¶] One, he or she may have directly committed the crime. I would call that person the perpetrator. [¶] Two, he or she may have aided and abetted the perpetrator who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (Italics added.) Garrett contends the trial court erred in so instructing the jury because the italicized portion of the instruction "suggests that an aider and abettor is vicariously responsible for the intent as well as the acts of the perpetrator and is equally guilty with the direct perpetrator." He further asserts that the error was exacerbated by the prosecutor's statement that an aider and abettor is "just as guilty as" the perpetrator. Again, we are not persuaded.

Garrett bases his contentions on *People v. Nero* (2010) 181 Cal.App.4th 504, 514 (*Nero*), which found that an aider and abettor can be found guilty of a crime lesser than the crime committed by the perpetrator, and thus, an earlier version of CALCRIM No. 400 that stated that " ' "[a] person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it" ' " was misleading. (*Nero*, *supra*, at p. 517.)

The word "equally" has since been removed from CALCRIM No. 400, which now reads in pertinent part: "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." The jury in this case was instructed with the current version of CALCRIM No. 400. Even assuming, as Garrett claims, that, as amended, CALCRIM No. 400 could be interpreted as suggesting that an aider and abettor is vicariously

23

responsible for the intent and the acts of the direct perpetrator and are equally guilty as the direct perpetrator, we find there is no chance the jury was misled here. Reviewing the instructions as a whole, as we must (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220), we find no "reasonable likelihood that the instruction [on aider and abettor liability] caused the jury to misconstrue or misapply the law." (*People v. Thornton* (2007) 41 Cal.4th 391, 436).

Immediately after instructing the jury in the language of CALCRIM No. 400, the trial court instructed the jury in the language of CALCRIM No. 401 as follows: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] One, the perpetrator committed the crime. [¶] Two, the defendant knew ... the perpetrator intended to commit the crime; and [¶] Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing that crime; and [¶] Four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." The additional instructions clarified any possible ambiguity concerning the intent required for Garrett to be convicted as an aider and abettor. In particular, CALCRIM No. 401 ensured that the jury understood that to find Garrett guilty as an aider and abettor, they had to conclude that he knew Hamilton and the other men intended to force C.G. to orally copulate them and that Garrett himself intended to aid and abet in the commission of those forcible oral copulations.[fn] Accordingly, the trial court properly instructed the jury on aider and abettor liability.

> [fn] Because we conclude the jury was properly instructed with CALCRIM No. 400, we need not consider Garrett's claim that his trial counsel was ineffective in failing to object to the giving of that instruction.

*Hamilton*, 2013 WL 3961167, at *10.

## C. Analysis of Instructional Error Claim

To the extent petitioner's due process argument is based on violations of state law it fails, because the state court did not find the instruction violated state law. This court is bound by the state court's determination of its own laws. See <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); <u>see also Mullaney v. Wilbur</u>, 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

////

24

On its face, CALCRIM No. 400 does not explicitly state that an aider and abettor bears equal responsibility as the perpetrator of a crime nor does it impute the perpetrator's intent to the aider and abettor. Further, and as discussed by the Court of Appeal, any ambiguity in CALCRIM No. 400 was clarified in the following instruction.

After providing the jury with CALCRIM No. 400, the court instructed:

> To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> One, the perpetrator committed the crime.
>
> Two, the defendant knew in [sic] the perpetrator intended to commit the crime; and
>
> Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing that crime; and
>
> Four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

(3 RT 656-57.)

The jury was informed that an aider and abettor is liable only based on the specific intent to aid and abet. Petitioner fails to show CALCRIM No. 400, when taken in context, was erroneous, much less that it rendered his trial fundamentally unfair. Further, petitioner's argument that prosecutorial misconduct contributed to the prejudicial effect of the instruction is baseless. (See ECF No. 1 at 59.) The prosecutor stated that aiders and abettors are "just as guilty as the perpetrator of the crime" in the context of describing the specific intent necessary for the crime of aiding and abetting. (See 3 RT 639; 2 RT 567.) Nothing about the prosecutor's argument would have lead the jury to think the perpetrator's intent could be imputed to the aider/abettor. Accordingly, claim five will be denied.

## VI. Unreliable DNA Profile Evidence Violated Due Process

Again, petitioner bases his claim here on co-defendant Garrett's argument in his petition for review. (ECF No. 1 at 61-62.) The DNA evidence was the only evidence identifying Garrett as a

perpetrator. The same is not true for petitioner here, who was identified at trial by the victim.

Therefore, much of the focus of Garrett's argument is not relevant to petitioner. However, the basis for Garrett's argument is that the DNA evidence was unreliable because the DNA experts disagreed over one aspect of petitioner's DNA profile. The court considers this argument below.

The legal standards for considering a claim that the admission of evidence at trial violated due process are stated above. To summarize, petitioner must show the evidence "is almost entirely unreliable," and that it rendered the trial "fundamentally unfair." See Holley, 568 F.3d at 1101. The factual background for this claim is described in the decision of the Court of Appeals.

## A. State Court Decision

### The DNA Evidence Is Not Unreliable

Garrett also claims that the judgment must be reversed because "it rests on unreliable DNA evidence." As we shall explain, there is no evidence to support Garrett's charge.

The prosecution's DNA expert Angelynn Shaw testified that Garrett's DNA profile was found in five different areas on C.G.'s body and clothing, namely her tank top, left arm, back, and two stains on her jeans. Garrett's DNA profile was estimated to occur at random in one in one sextillion of the African–American population; one in one hundred sextillion of the Caucasian population; and one in two hundred and seventy sextillion of the Hispanic population.

Defense expert Nikki Sewell, a colleague of Shaw's, reviewed Shaw's findings and obtained the same profiles for Garrett and Hamilton. Sewell did not disagree with any of Shaw's findings pertaining to Garrett, including Shaw's findings that Garrett's DNA profile matched the DNA samples taken from C.G. Sewell did, however, disagree that Hamilton's profile included a tri-allele in the form of a 24 at location D2. Sewell noted that tri-alleles are difficult to diagnose and subject to interpretation by the analyst within lab guidelines. Sewell determined that the 24 at location D2 was high stutter, while Shaw analyzed it as a tri-allele. Sewell did not think either interpretation was incorrect because lab protocol granted leeway as to whether to analyze the 24 at location D2 as high stutter or an actual allele peak. Sewell's determination that the 24 at location D2 was high stutter as opposed to a tri-allele does not in any way undermine Shaw's findings concerning Garrett's DNA profile, with which Sewell agreed.

There is no evidence to support Garrett's charge that the DNA evidence upon which his convictions are based is unreliable.

Hamilton, 2013 WL 3961167, at *11.

## B. Analysis of Claim of Unreliable DNA Evidence

The fact that there was one source of disagreement between the experts regarding petitioner's DNA profile does not reasonably lead to a conclusion that the entire science of DNA evidence was so unreliable as to violate due process. Petitioner presented no evidence to the state appellate court by way of a habeas petition, or otherwise, to show that the DNA evidence that inculpated him was not reliable in any other way. He had every opportunity to make that argument at trial. Petitioner fails to show the DNA evidence rendered his trial fundamentally unfair and the state court's rejection of that claim was, thus, not unreasonable.

## VII. Conclusion

Petitioner has failed to establish that the decision of the state courts rejecting his claims was contrary to, or an unreasonable application of, clearly established federal law or was an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Because petitioner has not satisfied the requirements of § 2254(d), his petition will be denied.

## CERTIFICATE OF APPEALABILITY

Having found that petitioner is not entitled to habeas relief, the Court now turns to the question of whether a certificate of appealability should issue. See Rule 11, Rules Governing Section 2254 Cases. A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller–El v. Cockrell, 537 U.S. 322, 335–36 (2003).

The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

////

27

(c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

    (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

    (B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition on the merits, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of [the petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller–El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his ... part." Miller–El, 537 U.S. at 338.

In the present case, the court finds that reasonable jurists would not find the court's determination that petitioner's federal habeas corpus petition should be denied debatable or wrong, or that the issues presented are deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Therefore, the Court declines to issue a certificate of appealability.

////

////

////

////

////

////

////

For the foregoing reasons, IT IS HEREBY ORDERED as follows:

1. Petitioner's petition for a writ of habeas corpus is denied;

2. The Clerk of the Court is directed to close the case; and

3. The court declines to issue a certificate of appealability.

Dated: August 3, 2017

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-habeas/hami1985.final order